**Oscar L. BOLTON, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

No. 94–342.

United States Court of Veterans Appeals.

Aug. 30, 1995.

Jeffrey Wood was on the brief for the appellant.

Mary Lou Keener, General Counsel; Norman G. Cooper, Assistant General Counsel; Thomas A. McLaughlin, Deputy Assistant General Counsel; and John McNamee were on the brief for the appellee.

Before FARLEY, IVERS, and STEINBERG, Judges.

FARLEY, Judge, filed the opinion of the Court.

IVERS, Judge, and STEINBERG, Judge, filed separate concurring opinions.

FARLEY, Judge:

This is an appeal from a January 12, 1994, decision of the Board of Veterans' Appeals (BVA or Board) which denied the appellant's claim for an increased rating for post-traumatic stress disorder (PTSD). The appeal is timely, and this Court has jurisdiction pursuant to 38 U.S.C. § 7252(a). For the reasons set forth below, the Court will vacate the Board's decision and remand the matter for readjudication consistent with this opinion.

## I.

The appellant served on active duty from November 1968 to August 1971. Record (R.) at 5, 18. In November 1984, the appellant was incarcerated at the Morgan County Regional Correctional Facility at Wartburg, Tennessee, with a scheduled release date of March 3, 2005. R. at 123. In July 1985, he received a 10% rating for service-connected PTSD. R. at 17–20, 22.

In March 1991, the appellant filed a claim for an increased rating. R. at 77, 99. He wrote that he had been denied jobs because of his PTSD, that he had worked alone in his prison job in the laundry, that his medical condition had deteriorated because of his PTSD, and that he had suffered a "flashback" which had resulted in injuries. R. at 78–79. The appellant submitted a medical treatment record which recorded that on July 16, 1987, he had complained of "anxiety, flashbacks in [the] twilight sleep [and] nightmares." R. at 56, 95. The prison psychologist had diagnosed "anxiety [secondary] to [PTSD]." *Ibid.* The treatment record also reported that on July 21, 1987, the appellant had received medical attention after reporting that he had been sleeping, "and [the] next thing he knew [he] had fallen [and] struck [his] head on [the] door." *Ibid.* The medical practitioner had noted a superficial one inch laceration to the appellant's forehead and a small raised area on his nose. *Ibid.* The appellant also provided an affidavit from Pat Lankford, a correctional officer at the county facility, which stated:

> [A]lthough I have no formal medical training, I feel strongly that Oscar Bolton exhibits personality traits which would seriously handicap him in getting and holding a job in a free society. However, while Oscar has a job as a "landury (sic) man[,]" *he has no co-workers,* as the landury (sic) job is a one-man-operation.

> Further, I have observed that Oscar is a "loner", who has minimal interaction with his fellow inmates, and does not participate in any extracurricular activities.

R. at 81. The appellant also submitted "Job Register Placement" forms which recorded that in September and October 1990, the appellant had requested to work as a carpenter, upholsterer, sewing machine operator, "Comm.Cleaner," and building trades apprentice, but that all of his requests had been denied "due to medical limitations." R. at 90–94.

In March 1991, the VA regional office (RO) denied the appellant's claim stating that "There is no current evidence showing his disability has increased in severity." R. at 99. In September 1991, the appellant filed a Notice of Disagreement (R. at 103), and in October 1991, he perfected his appeal to the Board. R. at 112. In a decision dated April 28, 1992, the Board remanded the appellant's claim to the RO, noting that the appellant had not received a psychiatric examination since June 1989. R. at 125–28. The Board ordered the RO to "take appropriate action to obtain copies of any clinical records that may exist reflecting psychiatric or psychological treatment" during his incarceration, and that the RO

> should take appropriate action to have the veteran undergo a VA psychiatric examination for the purpose of ascertaining the current nature and extent of his psychiatric disablement. The examiner is specifically requested to comment on the degree of social and industrial impairment attributable to [PTSD]. All studies deemed necessary should be performed. The *claims folder* should be made available to the

examiner for review prior to the examination.

R. at 127.

The medical treatment records from the Tennessee Department of Corrections were received (R. at 136–55), including a March 1986 and a May 1990 "Health–Related Work Classification Summary" which reported that the appellant had been placed on limited duty with "periodic attention required." R. at 137–38, 148. The examiner also noted three specific work limitations (i.e., "[s]hould not work around potentially dangerous machinery or equipment"), and annotated that the appellant's physical disabilities were "[o]rthopedic [d]isease or [d]isorder ?? by [history] ... [and] [p]sychosis/[m]ental [i]llness." *Ibid.* The records also included a mental health evaluation for the Board of Parole dated May 30, 1990, by Dr. Nguyen, a fourth-year psychiatry resident at Meharry Medical College. R. at 150–53. Dr. Nguyen reported that he had conducted a clinical interview with the appellant and reviewed the appellant's institutional files including a "Facts of the Offense report." R. at 150. He concluded that "Mr. Bolton has a long history of conduct disorder from his childhood that involved his adulthood with Antisocial Personality Disorder. He has no evidence of [PTSD] from the Vietnam war." R. at 152.

In September 1992, the RO wrote to the Chief of the VA Outpatient Clinic in Knoxville, Tennessee, requesting that he arrange for a VA examination of the appellant, as required by the BVA remand, by coordinating with the warden of the correctional facility, and enclosed the appellant's claims folder for the examiner's review. R. at 164. However, Dr. Howard, Chief Medical Officer at the VA Knoxville Outpatient Clinic, responded by writing that the "clinic is unable to find a fee base psychiatrist [who] will do an examination at the institution. [Also,] Mr. Luther Townley, Health Administrator at the institution ... does not have any physician [who] will do this type of specialized examination." R. at 172.

In January 1993, the RO issued a confirmed rating decision denying the appellant an increased rating. R. at 176–77. The RO referenced Dr. Nguyen's report, and then concluded:

A review of your VA files shows that your appeal ... was remanded to this office for additional medical evidence. However, since you are incarcerated at the Morgan County Regional Correction Facility, we have been unable to obtain the necessary VA examination, as requested by the [BVA], in order to reconsider your claim for an increased evaluation. Therefore, the available medical evidence does not show an increased evaluation is warranted and your [PTSD] remains 10% evaluated.

R. at 177. In February 1993, the appellant requested an examination "as order[ed] by the BVA." R. at 184. In response, the RO inquired when the appellant expected to be released from prison, informed him that "since you were incarcerated, the examination could not be done," and advised him that, "since no current medical evidence is available, no change is warranted in the current evaluation of your [PTSD]." R. at 188. The appellant responded that he did not know when he would be released from prison. R. at 190.

In January 1994 BVA decision, the Board decided that "the preponderance of the evidence [was] against [the appellant's] appeal for an increased rating for [PTSD]." R. at 5. The Board, relying upon the May 1990 evaluation of Dr. Nguyen, wrote:

Significantly, the examiner found no evidence of [PTSD], and the veteran's emotional problems were thought to be related to factors including drug and alcohol withdrawal. The pertinent diagnoses were multiple substance dependence, by history, and antisocial personality disorder. Inasmuch as subsequent efforts by the RO, most recently in November 1992, to arrange for the veteran's psychiatric examination, pursuant to the provisions of 38 C.F.R. § 3.327 (1992) authorizing reexaminations by the VA to verify the current severity of a disability, have been unavailing, we must *use our best judgment* to determine what we feel is his current level of symptomatology. However, even as-suming, without conceding, that any such current symptomatology may be produc-

tive of some social inadaptability, we must emphasize that there is *no clinical evidence* that any interruption in any preincarceration employment held by the veteran was occasioned by anything other than criminal conduct, as opposed to any factor related to [PTSD]; and that there is, similarly, no clinical evidence relating any recent disqualification from any work or job training opportunity offered in conjunction with the veteran's current incarceration to his [PTSD].

R. at 8 (emphasis added).

The appellant filed a timely appeal to this Court, arguing that VA violated its duty to assist him by not providing a psychiatric examination as instructed by the Board upon remand to the RO. Appellant's Brief (Br.) at 5–7. The appellant also argues that, pursuant to 38 U.S.C. § 5711, VA has subpoena power and should have issued a subpoena to require the correctional institution to release him with guards, as needed, so that VA could provide the psychiatric examination at the closest VA medical facility. *Id.* at 6. The appellant asserts that the Board erred when it failed to provide an adequate statement of reasons or bases for finding more persuasive the 1990 medical diagnosis which failed to diagnose PTSD than the two other examination reports of record which diagnosed PTSD. *Id.* at 7–8. Finally, the appellant argued that the BVA erred when it failed to consider all the evidence, to include his testimony that he could not work with others and the "Health–Related Work Classification Summary" documents he submitted to show the limitations placed upon his job assignments due to his medical condition. *Id.* at 8–10.

The Secretary argues that the BVA decision should be vacated because the appellant's claim was not well grounded. Secretary's Br. at 6–8. In the alternative, the Secretary argues that the decision should be affirmed because it was predicated on a plausible basis in the record, the May 1990 psychiatric evaluation. *Id.* at 8–10.

## II.

■ Section 5313 of title 38, U.S.Code, provides limitations on payments of compensation to incarcerated veterans, and states that a veteran incarcerated for a period in excess of sixty days for conviction of a felony

shall not be paid such compensation . . . in an amount that exceeds—

(A) in the case of a veteran with a service-connected disability rated at 20 percent or more, the rate of compensation payable under section 1114(a) . . . or

(B) in the case of a veteran with a service-connected disability not rated at 20 percent or more . . . one-half of the rate of compensation payable under section 1114(a) of this title.

38 U.S.C. § 5313(a)(1); *see* 38 C.F.R. § 3.665(d)(1), (2) (1994). Under 38 U.S.C. § 1114(a), a veteran rated as 10% disabled receives monthly compensation of $87. The appellant is currently rated only 10% disabled, and thus receives only one-half the compensation due pursuant to 38 U.S.C. § 1114(a), currently $43.50 per month. If the appellant's disability rating were to be increased to 30%, as he has requested, he would then receive the amount of compensation due under 38 U.S.C. § 1114(a), currently $87 per month. Therefore, this appeal presents a "case or controversy" ripe for judicial review. *See Mokal v. Derwinski,* 1 Vet.App. 12, 15 (1990).

## III.

■ Pursuant to 38 U.S.C. § 5107(a), a claimant "shall have the burden of submitting evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded." 38 U.S.C. § 5107(a); *see also Tirpak v. Derwinski,* 2 Vet.App. 609, 611 (1992). A claim for an increased evaluation is a new claim, not a reopened claim, and thus it is subject to the well-groundedness analysis. *Stanton v. Brown,* 5 Vet.App. 563, 565 (1993). A well-grounded claim is one which is plausible, "meritorious on its own or capable of substantiation." *Murphy v. Derwinski,* 1 Vet.App. 78, 81 (1990); *see also Grottveit v. Brown,* 5 Vet.App. 91, 92 (1993) (a well-grounded claim creates "a belief by a fair and impartial individual that the claim is plausible" (quoting *Tirpak,* 2 Vet.App. at 611)). Although the Board found, without analysis, the appellant's claim to be well

grounded, the determination of whether a claim is well grounded is a matter of law which this Court reviews de novo. *See Yabut v. Brown,* 6 Vet.App. 79, 82 (1993); *Grottveit,* 5 Vet.App. at 92; *King v. Brown,* 5 Vet.App. 19, 21 (1993).

■ The appellant has claimed entitlement to a rating increase for his service-connected PTSD. The appellant's assertion that this disability had worsened is adequate to make the claim well grounded. *See Proscelle v. Derwinski,* 2 Vet.App. 629, 632 (1992) (finding a claim for an increased rating well grounded when the appellant asserted that his service-connected disability had worsened since the prior rating); *see also Lathan v. Brown,* 7 Vet.App. 359, 365 (1995) ("The threshold of plausibility to make a claim well grounded is considerably lower than the threshold for new and material evidence to justify reopening a claim").

## IV.

### A.

The Board is required to provide "a written statement of [its] findings and conclusions, and the reasons or bases for those findings and conclusions, on all material issues of fact and law presented on the record...." 38 U.S.C. § 7104(d)(1). In *Gilbert v. Derwinski,* 1 Vet.App. 49 (1990), the Court wrote:

> The Board must identify those findings it deems crucial to its decision and account for the evidence which it finds to be persuasive or unpersuasive. These decisions must contain clear analysis and succinct but complete explanations. A bare conclusory statement, without both supporting analysis and explanation, is neither helpful to the veteran, nor "clear enough to permit effective judicial review," nor in compliance with statutory requirements.

*Id.* at 57 (citation omitted).

■ Here, the Board concluded that the appellant's claim for an increased rating should be denied, but the Board's decision failed to "account for the evidence which it finds to be persuasive or unpersuasive," for the record contained evidence supporting the appellant's claim which the BVA did not ad-

dress in its decision. Specifically, the record contained a prison treatment record which discussed the appellant's complaints and treatment for anxiety flashbacks and sleep disturbances attributed to his PTSD (R. at 56), and 1991 prison treatment plans for treating his PTSD in the future (R. at 139). Further, the record contained evidence of restricted job assignments attributed to "medical limitations." R. at 90–94. Yet the BVA merely concluded that there was no clinical evidence "relating any recent disqualification from any work or job training opportunity offered in conjunction with the veteran's current incarceration to his [PTSD]." R. at 8.

The BVA decision also provided an inadequate analysis of Mr. Lamont's affidavit, a material piece of evidence which the appellant asserts proved industrial impairment. Although the BVA referenced this affidavit when it wrote that the appellant had submitted a statement "by a correctional officer, wherein the veteran is characterized as an individual who avoids interaction with fellow inmates and works without co-workers in a one-man laundry position" (R. at 8), the Board did not comment upon the evidentiary significance, if any, it had given this document. Such treatment of the evidence does not meet the standard set in *Gilbert,* for the Board did not "account for the evidence which it finds to be persuasive or unpersuasive," *Gilbert,* 1 Vet.App. at 57, or "analyze the credibility and probative value of all material evidence submitted by and on behalf of a claimant, and provide the reason for its rejection of any such evidence." *Caluza v. Brown,* 7 Vet.App. 498, 506 (1995); *see also Gabrielson v. Brown,* 7 Vet.App. 36, 40 (1994); *Gilbert, supra.*

### B.

■ Once a claimant has satisfied his initial burden of submitting a well-grounded claim, VA has an affirmative duty to "assist such a claimant in developing the facts pertinent to the claim." 38 U.S.C. § 5107(a); *see Proscelle, supra.* "Where the record does not adequately reveal the current state of the claimant's disability and the claim is well grounded, the fulfillment of the statutory

duty to assist requires a thorough and contemporaneous medical examination." *Allday v. Brown,* 7 Vet.App. 517, 526 (1995) (citing *Suttmann v. Brown,* 5 Vet.App. 127, 138 (1993); *Green (Victor) v. Derwinski,* 1 Vet. App. 121, 124 (1991)). Further, "[w]here the veteran claims a disability is worse than when originally rated, and the available evidence is too old to adequately evaluate the current state of the condition, the VA must provide a new examination" to fulfill its duty to assist. *Olson v. Principi,* 3 Vet.App. 480, 482 (1992) (citing *Proscelle, supra* ).

Here, the Board properly identified a need for a current examination when it remanded the appellant's claim in 1992 and ordered a psychiatric examination to determine "the current nature and extent of [the appellant's] psychiatric disablement . . . [,] specifically . . . the degree of social and industrial impairment attributable to [PTSD]." R. at 127. The Board also ordered the RO to make the appellant's claims folder available to the examiner, who was to conduct all studies necessary to make the requested determinations. However, a current examination was not obtained, and the Board chose to rely upon a 1990 examination conducted at the request of the Parole Board by a psychiatry resident who did not have the appellant's claims folder to review. Such an examination neither fulfills VA's duty to assist, nor constitutes an adequate predicate for both the rating determination and the BVA's decision. *See* 38 C.F.R. §§ 4.2 (RO must return examination report that does not contain sufficient detail for rating purposes); 19.9 (BVA must remand case to RO where "further evidence . . . is essential for a proper appellate decision") (1994). Dr. Nguyen's report did not provide the information the BVA deemed necessary, and the Board should not have ceased in its quest for this necessary evidence to render its judgment on the appellant's claim. *See Allday, supra;* 38 C.F.R. § 19.9.

In *Wood v. Derwinski,* 1 Vet.App. 190 (1991), the Court stated:

> We do, however, caution those who adjudicate claims of incarcerated veterans to be certain that they tailor their assistance to the peculiar circumstances of confinement.

Such individuals are entitled to the same care and consideration given to their fellow veterans.

*Id.* at 193. Although the RO claimed an inability to get a fee-basis physician to conduct an examination in the correctional facility, the record contains neither information concerning the efforts expended by the RO in that regard nor any explanation as to why a psychiatrist employed by the VA was not directed to perform the examination. Under the unique circumstances presented by this case, where the Secretary has determined that the veteran is not available to participate in a VA examination under regular conditions, and in keeping with the "caution" of *Wood, supra,* a remand is required to provide the Secretary with another opportunity to fulfill his statutory duty to assist this appellant in developing the facts of his claim. *See* 38 U.S.C. § 5107(a); 38 C.F.R. §§ 4.1, 4.2, 4.10 (1994).

## C.

Finally, we do not agree with the argument by the appellant that the Secretary has the authority under 38 U.S.C. § 5711 to require the correctional institution to release the appellant with guards, as needed, so that VA could provide the psychiatric examination at the closest VA medical facility. Section 5711(a) of title 38, U.S.Code, authorizes the Secretary or his properly delegated representative to "(1) issue subpoenas for and compel the attendance of witnesses within a radius of 100 miles from the place of hearing . . . [and] (4) aid claimants in the preparation and presentation of claims." In 38 C.F.R. § 20.711 (1994), the Secretary has defined the scope of this subpoena power to compel the production of witnesses or evidence for a VA hearing. We do not read either the statute or the regulation as authorizing the Secretary to subpoena the warden at a state correctional facility and direct the release of the appellant from that facility for attendance at a VA hospital for a psychiatric examination. *Cf. U.S. v. Larkin,* 978 F.2d 964, 967–68 (7th Cir.1992) (discussing the federal government's use of a Writ of Habeas Corpus to obtain custody of a prisoner in a state facility pursuant to 28 U.S.C. § 2241).

## V.

Accordingly, the Board's January 12, 1994, decision is VACATED and the matter REMANDED for expeditious proceedings consistent with this opinion. *See* Veterans' Benefits Improvements Act of 1994, Pub.L. No. 103–446, § 302, 108 Stat. 4645, 4658 (1994) (found at 38 U.S.C. § 5101 note). On remand, after completion of the VA psychiatric examination, the Board may reevaluate the evidence and provide adequate reasons or bases for its conclusion, to include an explanation as to the applicability of the benefit-of-the-doubt rule as to each material issue in the case. 38 U.S.C. § 5107(b); *see Crowe v. Brown,* 7 Vet.App. 238, 249 (1994) (stating that the reasons or bases requirement of 38 U.S.C. § 7104(d)(1) applies to the Board's application of the benefit-of-the-doubt rule); *Williams (Willie) v. Brown,* 4 Vet.App. 270, 273–74 (1993) ("where there is significant evidence in support of an appellant's claim ... the Board must provide a satisfactory explanation as to why the evidence was not in equipoise").

IVERS, Judge, concurring:

I concur, as I must, in Judge Farley's excellent opinion in this case. I write separately to emphasize that the Court has arrived at the result in this case just as an appellate Court should, within our jurisdiction to "decide all relevant questions of law, interpret constitutional, statutory, and regulatory provisions and determine the meaning or applicability of the terms of an action of the Secretary." 38 U.S.C. § 7261(a)(1).

As is clearly and succinctly set forth in the opinion in this case, Congress has provided for payment of reduced compensation to qualified veterans during periods of incarceration. *See* 38 U.S.C. § 5313(a)(1). The provision reducing the amount of compensation available to certain incarcerated veterans was enacted in October 1980. *See* Pub.L. 96–385, § 504(a), 94 Stat. 1534, U.S.C.C.A.N. 1980, p. 3307, (Oct. 7, 1980). The Secretary, by regulation, has implemented the statute and has provided, in accordance with provisions of that statute, for payment of compensation in a reduced amount, to qualified veterans during periods of incarceration. 38

C.F.R. § 3.665 (1994). The legislative history of the statute reveals that differences existed between the House and the Senate regarding adding a new section to title 38 which would limit the payment of compensation, to otherwise eligible veterans, during confinement in a penal institution. The House favored limiting the payment of benefits to all incarcerated veterans. On August 6, 1980, the Senate passed its revision to the House bill (H.R. 7511) as an amendment to the Veterans' Disability Compensation and Housing Benefits Amendments of 1980. Prior to the Senate's adoption of H.R. 7511, the Senate version did not contain a provision limiting the payment of compensation to incarcerated veterans. Congressman Montgomery, the chairperson for the Subcommittee on Compensation, Pension, Insurance, and Memorial Affairs, in introducing the final version of the House–Senate compromise, stated:

Mr. Speaker, the purpose of compensation is to replace the lost earning capability of a disabled veteran where the impairment is caused by a service-connected condition. I do not consider it unreasonable to recognize that individuals who are confined by our judicial system for commission of a serious offense against society are no longer available to the labor market. An economic detriment caused by a disability is not felt by such individuals during long periods of confinement.

As you know, if a member of the Armed Forces commits a violent act so severe as to require a dishonorable discharge, such individual is precluded from receiving any veterans' benefits at all for the rest of his life. To me it is not unreasonable to expect a similar standard of conduct to be applied to veterans. I have great difficulty, as do many members of the committee, in providing a full range of Federal benefits to individuals serving long sentences for the commission of felonies.

I do not see the wisdom of providing hundreds and thousands of dollars of tax free benefits to such individuals when at the same time the taxpayers of this country are spending additional thousands of dol-

lars to maintain these same individuals in penal institution....

126 Cong.Rec. 26,118 (1980). Congressman Wylie, the ranking minority member of the Subcommittee on Compensation, Pension, Insurance, and Memorial Affairs stated:

.... I fully appreciate that compensation benefits have always been awarded by a grateful nation for disabilities suffered in the line of duty, and without regard to later economic status, and I have no philoso[p]hical difficulties with that concept. But, Mr. Speaker, the cast of an individual imprisoned for a felony—a serious, intentional crime against the very people who are being asked to reach into their pockets and pay taxes to pay such compensation— is an entirely different matter.

Even the military treats this situation differently. If a serviceman is injured on active duty and commits a felony prior to being discharged, he may well receive a bad conduct or dishonorable discharge. If so, he will receive no benefits whatsoever for the remainder of his life. Contrarily, under present law if the same individual is discharged and then commits the same felony, such payments are unaffected. In the case of imprisonment, when a prisoner is being fully supported by tax dollars that fund the penal institution, it becomes ludicrous to continue payment of benefits designed to help him maintain a standard of living. Thus, I believe the reduced stipend of $60 a month is reasonable and, indeed, generous. Personally, I would stop all compensation during incarceration for a felony. But, this is a good compromise.

....

126 Cong.Rec. 26,122 (1980). In the Senate, Senator Cranston, Chairperson of the Veterans' Affairs Committee, urged that the Senate concur in the House amendments to the Senate amendments to the bill. Senator Cranston stated:

Mr. President, in my view and in the view of other committee members, the House-passed provision not only raised questions of fundamental fairness but also threatened basic principles underlying the service-connected compensation programs. However, with the utmost reluctance and recognizing the depth of the feelings in the other body with regard to the issues involved—and, as I previously noted, Senator Thurmond and I personally met with Representatives Montgomery and Wylie— we have reached an accord on the provisions in the compromise agreement, provisions that I believe are consistent with notions of fundamental fairness.

....

126 Cong.Rec. 27,012 (1980).

I write separately to highlight the debate and the policy underlying the enactment of section 5313 of title 38 permitting the payment of benefits, albeit at a reduced rate, to incarcerated veterans. An incarcerated veteran who is under the watchful eye of Federal or State authorities is not engaging in a type of lifestyle, the quality of which must be improved or maintained by the payment of compensation. Nor would it seem that that veteran is engaged in activities involving "earning capacity" as envisioned by the drafters of 38 U.S.C. § 1155, or the rating schedule adopted in accordance therewith. *See* 38 C.F.R. § 4.1.

The Court today imposes a requirement on the Secretary in carrying out the duty to assist under 38 U.S.C. § 5107(a) and 38 C.F.R. § 3.159 (1994), that was, perhaps, not contemplated by Congress when it enacted 38 U.S.C. § 5313. However, we cannot now lightly infer that the duty to assist a veteran in developing his claim applies any less to an incarcerated veteran than to a non-incarcerated veteran. *See Wood v. Derwinski,* 1 Vet.App. 406 (1991). This is especially so in light of the eligibility of incarcerated veterans to receive payment of compensation while they are in a penal institution. The language of the statute is plain, and thus does not suggest a contrary result. *Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). When construing the meaning of a statute, a Court is "bound by the choices Congress has made, not the choices we might wish it had made." *Farrar v. Hobby,* 506 U.S. 103, 118, 113 S.Ct. 566, 568, 121 L.Ed.2d 494 (1992). The duty of the Courts is to enforce the laws enacted by the legislature, "however much we might question its wis-

dom or fairness." *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 471, 112 S.Ct. 2589, 2598, 120 L.Ed.2d 379 (1992). "If the effects of the law are to be alleviated, that is within the province" of Congress. *Id.* Should Congress, in its wisdom, deem it necessary to change the statute, that authority lies with Congress and not with this Court. *Id.* In contemplation of the current policy and political climate, I note that, currently pending before the Senate as part of the National Defense Authorization Act for Fiscal Year 1996, is a bill introduced by Senator Barbara Boxer of California, which would amend titles 10 and 37 of the United States Code, and terminate the pay and benefits of any member of the Armed Forces upon conviction of a serious crime; if that conviction is overturned on appeal, full back pay would be awarded. 141 CONG.REC. S. 205 (daily ed. Jan. 11, 1995) (statement of Sen. Boxer). This bill provision has bipartisan cosponsorship and has the support of the Secretary of Defense.

At a time when the leadership of both the Executive and Legislative Branches of Government is advocating a reexamination of the way Government does business and examining ways in which to reduce the costs thereof, perhaps questions regarding the policy underlying the provision of compensation to incarcerated veterans should be raised in a forum where they can be fully aired and where changes, if warranted, can be made. Perhaps the time has come to renew the debate which resulted in the passage of 38 U.S.C. § 5313.

STEINBERG, Judge, concurring:

I write separately in response to the concurring opinion of Judge Ivers. First, I do not want silence to indicate agreement with the call for reexamination of the payment of any amount of disability compensation or dependency and indemnity compensation (DIC) to incarcerated veterans. Second, I wish to include further pertinent legislative history regarding the provision in order to clarify the positions and actions of the House and Senate. I express no view on the issues which Judge Ivers has urged be reexamined.

As to the legislative history, the following is the full excerpt from the Explanatory Statement prepared by the House and Senate Committees on Veterans' Affairs and explained in detail the compromise agreement that became section 504 of Public Law No. 96–385 in 1980:

Sec. 504. The House bill would amend chapter 55 of title 38, United States Code, to provide that, during a service-connected disabled veteran's confinement in a Federal, State, or local penal institution as the result of the veteran's conviction of a felony or misdemeanor, the veteran's compensation may not exceed $60 per month after the first 60 days. Under this provision, the reduction after 60 days of incarceration would apply only to veterans rated 20 percent or more disabled, as long as the 10–percent rate is less than $60 per month. Amounts not paid to the veteran could be apportioned to the veteran's dependents. A similar limitation would apply to incarcerated recipients of DIC and death compensation payments. This provision would be effective with regard to payments for months after September 30, 1980. **The Senate amendment does not contain a comparable provision.**

The compromise agreement provides for a limitation along the lines of the House bill with the following provisions:

(1) The limitation would apply only to persons incarcerated for a felony conviction.

(2) The limitation would apply only to those whose offense is committed after the date of the enactment of this section and to those who are incarcerated on October 1, 1980, and awarded compensation or DIC after that date.

(3) The limitation would not apply to a person while he or she is participating in a work-release program or residing in a halfway house.

(4) Apportionments to dependents of veterans would be provided for under the same terms and conditions as are apportionments made pursuant to section 3107 of title 38, which governs apportionments in the cases of non-incarcerated compensation beneficiaries. Apportionments of DIC

would be provided for in a similar manner. However, no apportionment of the compensation, DIC, or death compensation of a person to whom the limitation applies could be made to a dependent who is incarcerated for conviction of a felony.

(5) With respect to veterans, the compromise agreement would limit the monthly amount of compensation payable to veterans rate[d] 20 percent or more disabled to the 10–percent rate ($54 under the compromise agreement) and, to veterans rated zero or 10 percent disabled, to half of the 10–percent rate ($27). The limitation would thus apply to all veterans rated as 10 percent or more disabled and to those whose rating is zero percent but who receive the rate provided under section 314(k) of title 38. With respect to DIC and death compensation recipients, the monthly amount payable would be limited to half of the 10–percent rate.

(6) No adjudications of total disability based on individual unemployability would be permissible during the period of the veteran's incarceration.

Under the compromise agreement, this section would be effective on the date of enactment.

The Committees note that it is their intention that the limitations provided for under the compromise agreement apply to persons convicted of felonies and sentenced to imprisonment while they are institutionalized in a hospital facility on transfer from (but not on parole from) a penal institution. In cases of prison-to-hospital transfer, the Committees consider that the hospital is serving as an agent of the penal institution. As has been noted, the limitation would not apply during a period during which the individual is participating in a work-release program even though, under such program, he or she returns to confinement during evenings or weekends. Restoration to the full rate would occur upon the person's release from incarceration, including release on parole. At such times, of course, any amount apportioned to dependents would be appropriately adjusted.

The Committees intend that, at the time action is taken to reduce an incarcerated veteran's or survivor's benefits under this section, the VA provide such veteran or survivor and those to whom apportionments may be made with notice of these apportionment provisions.

Explanatory Statement, Pub.L. No. 96–385, 96th Cong., 2d Sess. (1980) (emphasis added), *reprinted in* 1980 U.S.C.C.A.N. 3323, 3326–27; *see also* 126 CONG.REC. S27,014 (Sept. 24, 1980).

The bill which was eventually enacted as Public Law 96–385 was H.R. 7511, which was first passed by the House on July 21, 1980. 126 CONG.REC. H18,873 (1980). The counterpart Senate-reported bill, S. 2649, did not contain a provision with respect to the limitation of compensation and DIC for incarcerated persons. 126 CONG.REC. S21,426–30 (Aug. 6, 1980). Neither did the legislation (the text of S. 2649 as reported) passed by the Senate on August 6, 1980, as an amendment to H.R. 7511 in lieu of action on S. 2649. 126 CONG. REC. S21,447 (1980). On September 18, 1980, the House concurred in the Senate amendment with amendments, which represented a compromise agreement that had been negotiated and agreed upon by the two Committees on Veterans' Affairs. 126 CONG.REC. H26,110 (1980). On September 24, 1980, the Senate concurred in the House amendment to the Senate amendment. 126 CONG.REC. S27,008 (1980).

In explaining the Senate Committee's reluctant agreement to the compromise version negotiated between the two Committees, the Chairman of the Senate Committee stated:

In this connection, I would note that our committee's effort to sustain the Senate position included a September 17 meeting attended by the distinguished Senator from South Carolina (Mr. THURMOND), myself, and the very able chairman (Mr. MONTGOMERY) and ranking minority member (Mr. WYLIE) of the House Veterans' Affairs Committee Subcommittee on Compensation, Pension, Insurance, and Memorial Affairs.

In that meeting, we ... argued strongly against the House provisions in H.R. 7511 limiting the payments of disability compen-

sation and DIC to veterans and survivors during their incarceration for criminal convictions. However, much to our regret, we were unable to convince our House colleagues to accept our position, but I do appreciate their thorough consideration of our arguments on this point. Although they would not yield entirely from the House position, they were willing to make substantial concessions on the provision itself.

. . . .

Mr. President, the House bill, **but not the Senate amendment,** would have limited the amount of compensation and DIC benefits payable to persons who are incarcerated in penal institutions for felony or misdemeanor convictions. Under the House bill, compensation or DIC, after the first 60 days of incarceration could not exceed $60 per month.

At the present time, compensation payable to a veteran rated as 10–percent disabled is less than $60 per month; thus, this provision as passed by the House would have applied at the present time only to veterans rated 20 percent or more disabled and those whose rating is zero percent but who receive the rate provided under section 314(k) of title 38. Under the House bill, a similar limitation would apply to incarcerated DIC recipients, and amounts not paid to the veteran or DIC recipient could be apportioned to the veterans' dependents and survivors.

The compromise agreement provides for a limitation that would apply only to those who are convicted of felonies and only in situations where the offense is committed after the date of the enactment of this section or, if before, to those who are incarcerated on October 1, 1980, and awarded compensation or DIC after that date while incarcerated. The limitation would not apply at all to a person while he or she is participating in a work-release program or residing in a halfway house.

With respect to veterans, the monthly amount of compensation payable to veterans rated 20 percent or more disabled would be limited to the 10–percent rate— $54 under the compromise agreement—

and to veterans rated zero or 10–percent disabled, to half of the 10–percent rate— $27. The limitation would apply to all veterans rated as 10 percent or more disabled and to those whose rating is zero percent but who receive the rate provided under section 314(k) of title 38. With respect to DIC and death compensation recipients, the monthly amount payable would be limited to half of the 10–percent rate.

Most importantly, apportionments to dependents of incarcerated veterans would be paid under the same terms and conditions as are apportionments made pursuant to section 3107 of title 38, which governs apportionments in the cases of nonincarcerated compensation beneficiaries. Apportionments of DIC would be paid in a similar manner. However, no apportionment of the compensation or DIC of a person to whom the limitation applies could be made to a dependent who is incarcerated for conviction of a felony.

Finally, under these provisions, no adjudications of total disability based on individual unemployability would be permissible during the period of the veteran's incarceration.

Mr. President, in my view and in the view of other committee members, the House-passed provision not only raised questions of fundamental fairness but also threatened basic principles underlying the service-connected compensation programs. However, with the utmost reluctance and recognizing the depth of the feelings in the other body with regard to the issues involved—and, as I previously noted, Senator THURMOND and I personally met with Representatives MONTGOMERY and WYLIE—we have reached an accord on the provisions in the compromise agreement, provisions that I believe are consistent with notions of fundamental fairness.

I would like to emphasize that the limitation would apply only prospectively. It would apply generally only to those who commit felonies after the date of enactment, and no person who is currently serving a period of incarceration would, as a result thereof, lose any compensation ben-

efits which he or she has been awarded prior to October 1.

Under the provisions regarding apportionments, there would be absolutely no discretion on the part of the Administrator to deny or reduce apportionment—because of the felony conviction—on any factors other than those applicable generally to compensation and DIC apportionments. We believe it is very important to provide for the legitimate needs of the family of an incarcerated compensation or DIC recipient.

I also stress both committees' intention that the VA notify any affected veteran or DIC recipient of the apportionment provisions and that the VA also notify each prospective apportionee. It is important to note the committees' intentions in this regard because a dependent or other prospective apportionee may request an apportionment.

In my view, the various modifications of the House provisions reflected in the compromise agreement go far to overcome many of our committee's objections to this part of the House bill, and I appreciate the cooperation of the House Members in working out these provisions with us.

126 CONG.REC. S27,011, 27,012 (Sept. 24, 1980) (Statement of Sen. Cranston) (emphasis added).

Senator Thurmond, the senior Republican on the Committee, also expressed his disappointment with the final compromise in the following statement:

Mr. President, the original legislation by the House contained a provision that would deny compensation benefits to a veteran once that veteran became incarcerated, and upon release these benefits would be reinstated. **The Senate bill did not address this issue.** However, during consideration of this matter by the members of both Veterans' Committees, to reach a suitable resolution, the very theory and purpose of service-connected compensation was discussed. The compromise agreement, Mr. President, is not what I wanted nor was it the position of the Senate; yet, the House felt strongly on this matter and I believe this compromise is the best that could have been achieved under the circumstances.

Mr. President, VA compensation is paid to a veteran for his service-connected disability. The rate of payment reflects the average impairment of earning capacity as a result of this disability. It is my opinion that the economic or social status of the veteran should not determine his receipt of compensation. If a veteran's status in life was considered to be a factor in the receipt of compensation, then the argument could be made that a veteran who has a certain income level should have his compensation reduced. Thus, receipt of compensation would be a need-based and not totally related to a disability incurred while in service.

*Id.* at S27,017 (emphasis added).

I hope that the foregoing will help illuminate the positions of the House and Senate on the provisions that became 38 U.S.C. § 5313(a)(1).