# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 01-970

WILLIAM H. WANLESS, JR., APPELLANT,

v.

ANTHONY J. PRINCIPI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

Before KRAMER, *Chief Judge*, and STEINBERG and GREENE, *Judges*.

# O R D E R

The appellant appeals pro se an April 16, 2001, Board of Veterans' Appeals (Board or BVA) decision in which the Board denied him payment of full disability compensation during his period of incarceration. Record at 3, 6. The appellant and the Secretary each filed a brief, and the appellant filed a reply brief. The parties also each filed a supplemental memorandum and a response pursuant to Court orders. For the reasons that follow, the Court will vacate the April 2001 Board decision and remand the matter for proceedings consistent with this order.

In the instant case, the pivotal question is whether the appellant "is incarcerated in a . . . State . . . penal institution." 38 U.S.C. § 5313(a)(1). Specifically, the issue to be addressed is the relationship between the State of Oklahoma and the Davis Correctional Facility (DCF) or the Corrections Corporation of America, i.e, whether based on that relationship the DCF is a "State . . . penal institution" under 38 U.S.C. § 5313(a)(1). Although the Board concluded that the appellant is "incarcerated at a [S]tate prison" (R. at 5), the Board has not yet addressed the material issue whether DCF is a "State . . . penal institution" within the meaning of section 5313 and the issue regarding the relationship between the entities involved. Given that the resolution of those issues may involve very specific factual determinations regarding contracts and other documents that are best for the Board to make in the first instance, the Court concludes that it is premature for the Court to address this matter. *See Hensley v. West*, 212 F.3d 1255, 1263-64 (Fed. Cir. 2000) (court of appeals may remand if it determines that lower tribunal failed to make finding of fact essential to decision); *see also* 38 U.S.C. § 7104(d)(1); *Fallo v. Derwinski*, 1 Vet.App. 175, 177 (1991) ("[T]he Board's finding[s] and conclusions in this case are so vague that it is impossible to review them."); *Sammarco v. Derwinski*, 1 Vet.App. 111, 113-14 (1991) ("Whether the BVA's ultimate conclusions are correct or not, . . . the incomplete nature of the decision below does not permit proper review by this Court.").

On consideration of the foregoing, it is

ORDERED that the April 16, 2001, Board decision is VACATED and the matter is REMANDED for further proceedings consistent with this order.

DATED:   September 13, 2004                          PER CURIAM.

STEINBERG, *Judge*, concurring:  The pro se appellant appeals an April 16, 2001, Board of Veterans' Appeals (Board or BVA) decision in which the Board denied the appellant's claim for entitlement to the payment of full Department of Veterans Affairs (VA) disability compensation while incarcerated.  Record (R.) at 3, 6.  For the reasons that follow, I concur in the Court's order vacating the April 2001 Board decision and remanding the matter.

## I.  Background

The appellant served on active duty in the U.S. Army from September 1979 to November 1981.  R. at 9.  Subsequently, VA granted service connection to the appellant for enucleation of the right eye, chronic lumbar strain with degenerative disc disease, tinnitus, high-frequency hearing loss, and residuals of a cervical strain.  R. at 15, 23.  Since November 1981, he has been entitled to special monthly compensation (SMC), under 38 U.S.C. § 1114(k), based upon the loss of one eye, and he has had a 60% combined service-connected rating from December 1, 1986.  R. at 15-16, 21-23; *see* 38 U.S.C. § 1114 (setting forth ratings for VA disability compensation and SMC); 38 C.F.R. § 4.25 (2003) (regarding computation of combined ratings).  In January 1993, a VA regional office (RO) received, inter alia, a copy of a January 15, 1993, Judgment and Sentence rendered by the District Court of Payne County, Oklahoma (County District Court).  R. at 24-32.  That document reflects that the appellant had been convicted of a felony and that the County District Court had sentenced the appellant to life imprisonment without parole.  R. at 31.  That document further reflects that the term of the appellant's imprisonment was to "begin at and from the delivery of the [appellant] to the [Oklahoma] Department of Corrections [(ODOC)] at the Lexington Assessment and Reception Center."  *Ibid*.  The County District Court ordered the ODOC to "detain [the appellant] according to [its] judgment, sentence[,] and order."  *Ibid.*  Based on this document, the RO, in February 1993, notified the appellant that VA had proposed to reduce his benefits, effective March 16, 1993, in light of his incarceration for the conviction of a felony committed after October 7, 1980.  R. at 34.  In June 1993, he was notified by the RO that his disability compensation had been reduced, effective March 16, 1993.  R. at 36-37.

Since that time, the appellant several times has challenged the validity of VA's reduction of his disability compensation and VA has continued to deny the appellant's entitlement to the amount of monthly benefits he had received before March 16, 1993.  *See* R. at 46-85; *see also Wanless v. Veterans Admin.,* No. 95-5177, 1995 U.S. App. LEXIS 32074 (10th Cir. Nov. 16, 1995).  In a May 28, 1997, decision, the BVA rejected the appellant's argument that 38 U.S.C. § 5313 (reducing to 10% rate disability compensation payments for individuals incarcerated in excess of 60 days in "Federal, State, or local penal institution" for felony conviction) was unconstitutional, and the Board determined that the reduction of the appellant's benefits, from those concurrent with a 60% disability rating to those concurrent with a 10% disability rating, effective from March 1993, based on his

2

incarceration for a felony conviction, was proper. R. at 79-85. (Neither the Court's docket nor the record on appeal (ROA) reflects an appeal from that decision.) In April 1998, the RO received correspondence from the appellant; he argued that he was then entitled to the entire amount of his disability compensation because he was no longer incarcerated in a State penal institution in that he had been transferred to the Davis Correctional Facility. R. at 87-89. He asserted that "[t]he Davis Correctional Facility (DCF) is administered[] and owned[] by the Corrections Corporation of America (CCA)." R. at 87. He further argued that "CCA is a large, for-profit company [that is] set up to run prisons, [which are] not closely monitored by [S]tate officials." *Ibid.* Specifically, the appellant contended that DCF is not a State penal institution and that the legislative intent of 38 U.S.C. § 5313 does not support reducing his disability compensation. R. at 87, 89.

In March 1999, the RO disallowed the appellant's April 1998 claim for the reinstatement of his "full service[-]connected disability compensation". R. at 91. He timely filed a Notice of Disagreement in which he argued that 38 U.S.C. § 5313 does not apply to him because he is not confined in a State penal institution. R. at 93. The ROA contains an internal memorandum with both CCA and DCF on the letterhead, which memorandum reflects that the appellant is an inmate. R. at 96. (It appears from the ROA and the parties' pleadings that February 27, 1998, is the date on which the appellant was transferred to DCF. *See* R. at 87-89, 91, 98, 110-11, 124; Secretary's Brief (Br.) at 5-7.) On appeal to the Board, the appellant reiterated his prior arguments and further argued that "[h]istory does not reveal a tradition of 'like status' between private prisons and Federal and State [f]acilities." R. at 118-25, 132-39.

In the decision on appeal, the Board found that the appellant, in January 1993, was sentenced by the County District Court to life imprisonment without parole for the commission of a felony and that he "is still in prison under the life sentence imposed." R. at 2. The Board concluded that the appellant was not entitled to payment of the entire amount of his disability compensation while incarcerated for the commission of a felony. R. at 5. In so concluding, the Board, inter alia, reasoned:

> The mere fact that the State of Oklahoma has decided to allow for the private management of a penal facility **under a contract** does not serve to remove the [appellant's] felony conviction, nor does it serve to alter his status as a prisoner of the State of Oklahoma. It is this status as a convicted felon **in a [S]tate prison** that absolutely prohibits the payment of full disability compensation.

R. at 5 (emphasis added). The ROA does not contain a copy of any such contract as referred to above by the Board. The Board further stated:

> [The appellant's] claim requires determining whether or not he is still incarcerated as the result of a felony conviction. If so, the law presents an absolute prohibition against the payment of his full disability compensation. The evidence shows that he

3

is still incarcerated ***at a [S]tate prison*** as a result of his January 1993 conviction and sentencing for a felony offense.

*Ibid*. (emphasis added).

On appeal to this Court, the appellant, in his brief and reply, further reiterates his contention that section 5313 no longer applies to him. Appellant's Br. at 2-5. In support of his argument, the appellant asserts that Oklahoma law provides that "'[c]orrectional facilities owned or operated by private prison contractors shall not be deemed to be within the [ODOC] or other [S]tate agency.'" *Id.* at 2 (quoting OKLA. STAT. tit. 57, § 563 (2002) (Correctional facilities–Creation or construction–Approval of Legislature–Inmate work centers–Location)). He further argues that the Board did not address fully his arguments. *Id.* at 4. With respect to that argument, the Secretary concedes that the Board "did not appropriately note the facts in this case" but argues that the "Court should take account of the rule of prejudicial error." Secretary's Br. at 12-13. The Secretary further concedes the novelty of the issue raised in this case and argues:

> [T]he fact [that] the [a]ppellant is no longer housed in a penal institution managed by the State[ of Oklahoma] does not negate that the State has legal possession of the [a]ppellant and public monies fund his maintenance. The contractual relationship established between CCA and the State of Oklahoma essentially places CCA ***in the position of a [S]tate facility***, with respect to the intended purpose of § 5313. . . .
>
> . . . .
>
> The Secretary does not dispute that a private[-]management corrections company manages the facility in which the [a]ppellant resides (as shown by the [ROA]). . . . Hence, the Court has been called upon to resolve the issue of whether by virtue of the contractual arrangement between CCA and the State of Oklahoma, the [a]ppellant continues to be incarcerated in a State penal institution, as contemplated by the controlling statute.
>
> . . . .
>
> The Secretary respectfully submits that the [a]ppellant advocates a "literal" reading of this statute that is inconsistent with congressional intent. The course the [a]ppellant charts in this appeal would lead to an "absurd" result.

Secretary's Br. at 8-10 (emphasis added). He thus requests that the Court affirm the Board decision. *Id*. at 14. The Secretary also requests that "the Court . . . take judicial notice of information available on the CCA Web site, [which] . . . confirm[s] the contractual relationship between CCA and the State of Oklahoma." *Id*. at 11 n.1. In his reply, the appellant argues, inter alia, that section 5313 is ambiguous and that Congress enacted other similarly crafted statutes, such as 42 U.S.C. § 402(x)

(suspending Social Security benefits to prisoners confined, inter alia, in "jail, prison, or other penal institution or correctional facility"), without such ambiguity. Appellant's Reply Br. at 5. Thus, the appellant argues that the Court should resolve the ambiguity in section 5313 in his favor. *Id.* at 6.

The Court has issued two orders in this case for supplemental submissions from the parties. On June 16, 2004, the Court directed the Secretary to file with the Court (1) any appropriate document(s) reflecting the relationship between the State of Oklahoma and the DCF or the CCA and (2) a supplemental memorandum addressing whether the Court may take judicial notice of any such document(s). The Court further directed that the appellant may file a supplemental memorandum addressing this issue. The parties each filed responses to the Court's order. Attached to his July 1, 2004, supplemental memorandum, the Secretary provided copies of certain pages of a contract between CCA and the DCF and the ODOC. Secretary's Supplemental Memorandum, Exhibit E. In a July 20, 2004, order, the Court noted that the contract was incomplete and did not cover the entire period at issue. The Court, therefore, directed the Secretary to file with the Court "contracts, state attorney general opinions, or other complete documents that reflect that, from the time of the appellant's transfer to the DCF, the DCF has constituted a 'State . . . penal institution' within the meaning of 38 U.S.C. § 5313(a)(1) or other arrangement." Order at 2 (quoting 38 U.S.C. § 5313(a)(1)). The Court further directed the Secretary alternatively to advise the Court that no such documents exist. On July 26, 2004, the Secretary filed a response, attaching documents that he asserts demonstrate that DCF constituted a "State . . . penal institution" from February 1998, when the appellant was transferred to the DCF. Response at 2. On August 9, 2004, the appellant submitted a reply to the Secretary's response.

## II. Analysis

The appellant argues that the Court should interpret 38 U.S.C. § 5313 as inapplicable to him because DCF assertedly is not a "Federal, State, or local penal institution", 38 U.S.C. § 5313(a)(1), and because Congress' legislative intent in enacting this provision purportedly does not support the reduction of his disability compensation. The Secretary contends that "the appellant continues to be incarcerated in a State penal institution, as contemplated by the controlling statute" or, in the event that it is not deemed a State penal institution, the appellant's reading of section 5313 as being inapplicable to him is inconsistent with the provision's legislative intent and would lead to an absurd result. Secretary's Br. at 9-10.

### A. Plain Meaning of 38 U.S.C. § 5313(a)(1)

The Court reviews questions of statutory interpretation de novo; in interpreting a statute, the Court examines the language of the statute and, "'if the intent of Congress is clear, that is the end of the matter.'" *Cacatian v. West*, 12 Vet.App. 373, 376 (1999) (quoting *Gardner v. Brown*, 5 F.3d 1456 (Fed. Cir. 1993)*, aff'd,* 513 U.S. 115 (1994)); *see Trilles v. West*, 13 Vet.App. 314, 321 (2000) (en banc). "However, if 'it is clear that . . . the literal import of the text . . . is inconsistent with the legislative meaning or intent, or such interpretation leads to absurd results,' the Court will not reach

that result." *Trilles, supra* (citation omitted); *see Holliday v. Principi*, 14 Vet.App. 280, 285 (2001) (citing precedent regarding need to avoid absurd result when interpreting statute), *overruled on other grounds in part by Dyment v. Principi,* 287 F.3d 1377, 1385 (Fed. Cir. 2002), and *Bernklau v. Principi,* 291 F.3d 795, 806 (Fed. Cir. 2002).[1]

In pertinent part, section 5313 of title 38, U.S. Code, presently provides:

**Limitation on payment of compensation and dependency and indemnity compensation [(DIC)] to persons incarcerated for conviction of a felony.**

(a)(1)  To the extent provided in subsection (d) of this section, any person who is entitled to compensation or to [DIC] and who is incarcerated ***in a Federal, State, or local penal institution*** for a period in excess of sixty days for conviction of a felony shall not be paid such compensation or [DIC], for the period beginning on the sixty-first day of such incarceration and ending on the day such incarceration ends, in an amount that exceeds–

(A)  in the case of a veteran with a service-connected disability rated at 20 percent or more, the rate of compensation payable under section 1114(a) of this title; . . .

. . . .

(d)  The provisions of subsection (a) of this section shall apply (1) with respect to any period of incarceration of a person for conviction of a felony committed after October 7, 1980, and (2) with respect to any period of incarceration on or after October 1, 1980, for conviction of a felony of a person who on October 1, 1980, is incarcerated for conviction of such felony and with respect to whom the action granting an award of compensation or [DIC] is taken on or after such date.

38 U.S.C. § 5313 (boldface-italic emphasis added); *see* 38 U.S.C. § 1114(a) (setting forth VA disability compensation for 10% rating).  In the instant case, the plain language of section 5313 provides that a person entitled to compensation who is incarcerated in a "Federal, State, or local penal institution" in excess of 60 days (for conviction of a felony) is not entitled to the entire amount of his or her compensation beginning on the 61st day of incarceration but is entitled only to the rate payable for a 10% disability rating (if, as here, the veteran has a service-connected disability rated

---

[1]   *See also United States v. X-Citement Video, Inc.*, 513 U.S. 64, 68-69 (1994);  *Timex V.I., Inc. v. United States*, 17 F.3d 879, 886 (Fed. Cir. 1998); *Simmons v. Principi*, 17 Vet.App. 104, 114 (2003); *Thayer v. Principi*, 15 Vet.App. 204, 210 (2001);*Cottle v. Principi*, 14 Vet.App. 329, 334 (2001); *Faust v. West*, 13 Vet.App. 342, 350 (2000); *Davenport v. Brown*, 7 Vet.App. 476, 483-84 (1995); *Conary v. Derwinski*, 3 Vet.App. 109, 111-12 (1992) (per curiam order) (Steinberg, J., concurring).

at 20% or more). 38 U.S.C. § 5313(a)(1). On its face, this statutory reduction in compensation applies only to those persons incarcerated in a "Federal, State, or local penal institution" and does not apply to persons entitled to compensation who are not so incarcerated. *Ibid.* Accordingly, in my view, the plain meaning of section 5313 does not require a reduction of compensation unless the person entitled to compensation is incarcerated in a "Federal, State, or local penal institution". *Ibid.*; *see Cacatian*, *supra.*

## B. Parties' Other Contentions
### 1. DCF as a State Penal Institution

Here, neither party has contended that the appellant is incarcerated in a Federal or local penal institution. Thus, at issue is whether he is incarcerated in a State penal institution. The appellant contends that DCF is a privately owned and operated institution and thus not a State penal institution. The Secretary contends, echoed by our dissenting colleague, that DCF, which apparently is owned and operated by CCA, is a State penal institution "by virtue of the contractual arrangement between CCA and the State of Oklahoma" and that the BVA decision should be affirmed. Secretary's Br. at 9, 14.

In that regard, the Board is required to provide a written statement of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record; the statement must be adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See* 38 U.S.C. § 7104(d)(1) (Board "shall include . . . a written statement of the Board's findings and conclusions, and the reasons or bases for those findings and conclusions, on all material issues of fact and law presented on the record"); *Allday v. Brown*, 7 Vet.App. 517, 527 (1995); *Simon v. Derwinski*, 2 Vet.App. 621, 622 (1992); *Gilbert v. Derwinski*, 1 Vet.App. 49, 56-57 (1990). To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence that it finds persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. *See Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table); *Gabrielson v. Brown*, 7 Vet.App. 36, 39-40 (1994); *Gilbert*, *supra*. A failure to comply with this requirement creates an inadequate record that generally will frustrate effective judicial review of BVA decisions. *See Gilbert, supra*.

In the instant case, the Board failed to address the appellant's arguments below as to whether he currently is "incarcerated in a . . . State . . . penal institution." 38 U.S.C. § 5313(a)(1). Although the Secretary, as well as our dissenting colleague, attempts to undertake the Board's obligation to provide an adequate statement of reasons or bases, *see* Secretary's Br. at 11-13, this Court's jurisdiction extends to "review[ing] decisions of the Board", 38 U.S.C. § 7252(a). Hence, the Court's role is to review whether the Board in its decision, rather than the Secretary in his brief, provided an adequate statement of reasons or bases. Although in its April 2001 decision the Board made an *ipse dixit* conclusion twice that the appellant is "still incarcerated at a [S]tate prison" (R. at 5), such a conclusion does not address the material issue, i.e., whether DCF (which is apparently a privately owned and operated facility) is a "State . . . penal institution" **within the meaning of section 5313**.

Indeed, in reaching that conclusion, the Board did not discuss or analyze any state laws or any contractual provisions that may bear on that determination. *See Gilbert*, 1 Vet.App. at 57 (noting that "bare conclusory statement, without both supporting analysis and explanation, is neither helpful to the veteran, nor 'clear enough to permit effective judicial review', nor in compliance with statutory requirements").

In this regard, the appellant in his brief directs the Court to section 563 of title 57, Oklahoma Statutes, to support his contention that DCF is not a "State . . . penal institution", 38 U.S.C. § 5313(a)(1). *See* Appellant's Br. at 2, 4 (asserting that DCF is privately owned and operated facility and that OKLA. STAT. tit. 57, § 563, provides that "[c]orrectional facilities owned or operated by private prison contractors shall not be deemed to be within the [ODOC] or other [S]tate agency"). However, in its entirety, that Oklahoma statutory section provides:

A.  Except as otherwise authorized by [s]ection 183 of [t]itle 73 of the Oklahoma Statutes, before any correctional facility other than an inmate work center as authorized in subsection B of this section or an inmate drug offender work camp, whether within the [ODOC] or within any other [S]tate agency, may be created or any construction performed which may significantly increase, extend or expand the present facility, such creation or construction shall be approved by the Legislature. ***Correctional facilities owned or operated by private prison contractors shall not be deemed to be within the [ODOC] or other [S]tate agency.***

B.  The [ODOC] is hereby authorized to establish inmate work centers in locations where a need for labor to conduct public work projects is determined. The [ODOC] shall select the inmate work center locations based on objective comparisons of interested communities in accordance with procedures and criteria established by the [ODOC]. The procedures, selection criteria and decision case analysis shall be made available to the public upon request.

C. No [S]tate, county or municipal correctional facility including any inmate work center, inmate drug offender work camp, inmate halfway house, inmate transitional living center and ***any other place where [S]tate, county or municipal inmates are housed*** shall be located within one thousand (1,000) feet of any public or private elementary or secondary school nor within two thousand five hundred (2,500) feet of any state training school. The provisions of this subsection shall not apply to any inmate work center, inmate drug offender work camp, inmate halfway house, inmate transitional living center and any other place where [S]tate, county or municipal inmates are housed established prior to May 20, 1994. Provided[] that the provisions of this subsection shall not apply to [S]tate, county, or municipal correctional facilities that are granted permission to operate within the areas restricted by this subsection by a majority vote of the following entities:

8

1.  The district board of education of each school district with an affected school; and

2.  The governing body of each affected private school.

D.  In any county with a population of two hundred fifty thousand (250,000) or more, as determined by the latest Federal Decennial Census, the [ODOC] shall not cause, permit or require any inmate in the custody of the [ODOC] or cause, permit or require any offender under the supervision of the [ODOC] to enter, remain or be present in *any [ODOC] facility* located within one thousand (1,000) feet of a private or public elementary or secondary school, or on the grounds of such a facility, for any activities involving or relating to processing, training, instructing, interviewing, counseling, reporting, conferring, imposing discipline, reviewing or adjudicating or any correctional function requiring or permitting the presence of the offender, except offenders may be employed in construction, maintenance or janitorial activities in or on the structures or grounds while under supervision of a correctional employee.  The provisions of this subsection shall not apply to any facility established or acquired by the [ODOC] prior to May 20, 1994.

OKLA. STAT. tit. 57, § 563 (2003) (emphasis added).

Although there is language in section 563(A) that may appear to support the appellant's contention that DCF is not a "State . . . penal institution", 38 U.S.C. § 5313(a)(1), the crux of that section as a whole appears to be that an Oklahoma State agency must obtain approval from that State's legislature before building, renovating, or relocating a prison but that private prisons do not require such approval.  I note further that, for purposes of the State of Oklahoma's prohibition against locating correctional facilities within specified distances of certain schools, subsection C of section 563 appears to suggest that a private prison may be deemed a State, county, or municipal correctional facility depending on whether such facility houses "[S]tate, county, or municipal inmates", OKLA. STAT. tit. 57, § 563(C), as contrasted with subsection D, which appears to be limited in its reach to only certain ODOC facilities.

Moreover, section 502 of title 57, Oklahoma Statutes, in pertinent part, defines "[p]rivate prison contractor[s]" as follows:

a.  [A] non[-]governmental entity or public trust which, *pursuant to a contract* with the [ODOC], operates an institution within the [ODOC] other than a halfway house or intermediate sanctions facility, or provides for the housing, care, and control of inmates and performs other functions related to these responsibilities within a minimum or medium security level facility not owned by the [ODOC] but operated by the contractor . . . .

9

OKLA. STAT. tit. 57, § 502(7)(a) (2003) (emphasis added). I note that the Oklahoma Statutes provide numerous standards to govern contracts between the State and private prison contractors. In this regard, section 561(A) of title 57, Oklahoma Statutes, provides in pertinent part:

> A. The [ODOC] is hereby authorized to provide for incarceration, supervision, and residential treatment at facilities other than those operated by the [ODOC]. Services offered for persons under the custody or supervision of the [ODOC] are to include, but not be limited to, housing, alcoholism or drug treatment, mental health services, nursing home care, or halfway house placement. Such services must meet standards prescribed and established by the State Board of Corrections for implementing such a program, including but not limited to standards concerning internal and perimeter security, discipline of inmates, educational and vocational training programs, employment of inmates, and proper food, clothing, housing, and medical care.

OKLA. STAT. tit. 57, § 561(A) (2003). Further, subsection B of section 561.1 provides, in pertinent part:

> B. Any contract between the [ODOC] and a private prison contractor, whereby the contractor provides for the housing, care, and control of inmates in a nondepartmental facility operated by the contractor, shall contain, in addition to other provisions, terms and conditions:
>
> 1. Requiring the contractor to provide said services in a facility which meets accreditation standards established by the American Corrections Association [(ACA)];
>
> 2. Requiring the contractor to receive accreditation for said facility from the [ACA] within three (3) years of commencement of operations of the facility;
>
> 3. Requiring the contractor to obtain written authorization from the governing board of any municipality in which the facility is to be located, or if the facility is not to be located within a municipality, written authorization from the board of county commissioners of the county in which the facility is to be located; and
>
> 4. Granting the [ODOC] the option at the beginning of each fiscal year pursuant to an agreement, to purchase any such facility, with or without inventory or other personal property, at a predetermined price, which shall be negotiated and included in a schedule or a formula to be contained in the original agreement.

10

OKLA. STAT. tit. 57, § 561.1(B) (2003); *see* OKLA. STAT. tit. 57, § 561(M)(4) (2003) (private prison contractors must demonstrate "ability to comply with applicable court orders and corrections standards"). In addition, Oklahoma State courts have held that confinement in a privately owned prison that has a contract with the ODOC "does not alter [a person's] status as a prisoner" for purposes of relief pursuant to the Fair Labor Standards Act of 1938 (FLSA), ch. 676, § 1, 52 Stat. 1060 (codified as amended at 29 U.S.C. §§ 201, *et seq.*). *Washington v. Cornell Corr., Inc.*, 30 P.3d 1162, 1164 (2001) (inmate not entitled to FLSA protections because his relationship with privately owned corrections facility located in Oklahoma was based on his status as prisoner; thus, no employer-employee relationship existed). In connection with the remand directed by the Court in its instant order, the Board, in determining whether DCF may be deemed a "Federal, State, or local penal institution", 38 U.S.C. § 5313(a)(1), should consider the above-mentioned statutory provisions and caselaw, as well as any other potentially applicable law. *See Schafrath v. Derwinski,* 1 Vet.App. 589, 593 (1991) (holding that Board is required to consider, and discuss in its decision, all "potentially applicable" provisions of law and regulation).

Here, in regard to any relationship between the ODOC and DCF or CCA, the ROA does not contain any contract or other document reflecting an agreement between any of these entities addressing, inter alia, DCF's or CCA's status as a private prison contractor within the meaning of OKLA. STAT. tit. 57, § 502(7)(a), or any contract or document authorizing the transfer of the appellant to DCF. Although the Secretary requests that the Court take judicial notice of CCA's Web site as "confirming the contractual relationship between CCA and the State of Oklahoma" (Secretary's Br. at 11 n.1), any finding of fact as to the existence and/or significance of a contract between ODOC and DCF or CCA "is the province of the BVA" in the first instance, because the Court's scope of review is limited to the record of proceedings before the Secretary and the Board. *Falk v. West*, 12 Vet.App. 402, 405 (1999); *see* 38 U.S.C. §§ 7104(a), 7252(b).

Regarding the issue of the contractual relationship between the entities involved, I note that in response to this Court's July 20, 2004, order, the Secretary submitted, among other things, the following documents: (1) "Annual Renewal Lease and Operation Agreement" dated "as of" July 1, 1996, between Holdenville Industrial Authority (which apparently owned DCF) and ODOC, for a period of one year and providing for 18 one-year renewal periods beginning July 1, 1997, and ending June 30, 2016; and (2) the "Lease and Operation Agreement" dated "as of" July 1, 1996, between Holdenville Industrial Authority and ODOC; (3) the Correctional Service Contract, dated July 1, 1998, between CCA (which apparently was the operator of DCF) in Holdenville, Oklahoma, and ODOC; and (4) extension agreements of the contract identified in (3) above.

The Lease and Operation Agreement contains certain provisions that may be relevant to the factual issues involved here regarding the relationship between the entities. For example, section 2.11 (entitled "Independent Contractor") of Article II states as follows:

> The AUTHORITY [(Holdenville Industrial Authority)] is associated with the
> Transferring Entity [(ODOC)] only for the purposes and to the extent set forth in this

11

Agreement, and in respect of the performance of the Operation and Management Services, the AUTHORITY is and shall be an independent contractor and, subject to the terms of this Agreement, shall have the sole right (which right may be delegated to the Operator [(CCA)] pursuant to a management services agreement) to supervise, manage, operate, control, and direct the performance of the details incident to its duties under this Agreement either directly or through the Operator pursuant to the Management Services Agreement. Nothing contained in this agreement shall be deemed or construed to create a partnership or joint venture, to create the relationship of an employer-employee or principal-agent, or to otherwise create any liability for the Transferring Entity whatsoever with respect to the Bond indebtedness, liabilities, and obligations of the AUTHORITY. The AUTHORITY shall be solely responsible for and the Transferring Entity shall not have any obligation with respect to payment of all federal income, F.I.C.A., and other taxes owed or claimed to be owned by the AUTHORITY, arising out of this Agreement.

Secretary's Response (Resp.), Exhibit (Exh.) 1 at 11. There may be other provisions in this agreement relevant to this inquiry. *See*, *e.g.*, *id.* at 13 (providing in Article II, section 2.20, entitled "Taxes, Liens, Assessments, and Utilities", that the "AUTHORITY shall . . . pay . . . all lawful taxes and assessments levied or assessed by the . . . State"); 29 (providing in Article V, section 5.2(A), entitled "Representations and Warranties of the AUTHORITY", that "[t]he AUTHORITY is organized and existing as a public trust created under the laws of the State as an agency of the State and the duly constituted authority of the City"). I also note that although there are also subsequent correctional services contracts between CCA and ODOC that state that CCA is the owner of DCF and also appear to contain provisions entitled "Independent Contractor", the Secretary has not provided those contracts in their entirety and those provisions were not among those provided. *See*, *e.g.*, Secretary's Resp., Exh. 3 ("Correctional Services Contract" between CCA and ODOC for the period July 1, 2003, through October 31, 2003, Table of Contents showing Article 6, section 6.1, entitled "Independent Contractor Status").

In any event, even if judicial notice were to be taken of the existence of a contract between the ODOC and DCF or CCA, the fundamental inquiry, which the Board failed to address and to which the answer is presently unknown, is whether any such contract provides that DCF constitutes a "State . . . penal institution" within the meaning of 38 U.S.C. § 5313(a)(1). The Board thus failed to consider adequately "all . . . applicable provisions of law" and to provide an adequate statement of reasons or bases for its decision. 38 U.S.C. § 7104(a), (d)(1); *see Allday* and *Gilbert,* both *supra*. Accordingly, remand is appropriate unless the Secretary were to prevail on his alternative argument, discussed below, which I believe that he does not. *See Hicks v. Brown*, 8 Vet.App. 417, 422 (1995) (stating that remand rather than reversal is appropriate remedy when judicial review is frustrated by inadequate record below); *see also Pond v. West,* 12 Vet.App. 341, 346 (1999) (stating that remand is appropriate remedy when Board has failed to ensure proper development of claim); *Block v. Brown*, 7 Vet.App. 343, 346 (1994).

12

## 2. Secretary's Alternative Argument

The Secretary further argues that, even assuming that DCF is not a State penal institution, concluding that section 5313 is inapplicable to the appellant would be contrary to the legislative intent underlying the provision and would produce an absurd result. If the Court were to conclude that the Secretary was correct on this argument, such a conclusion would appear to obviate the need for remand. *See* 38 U.S.C. § 7261(b)(2) (in conducting review of BVA decision, Court shall take due account of rule of prejudicial error); *Conway v. Principi*, 353 F.3d 1369, 1373 (Fed. Cir. 2004) (concluding that Court not obligated to address expressly "rule of prejudicial error in each and every opinion"; however, Court cannot "flatly refuse[] to 'take due account of the rule of prejudicial error'"); *Soyini v. Derwinski,* 1 Vet.App. 540, 546 (1991).

As discussed above, the "plain meaning must be given effect unless a 'literal application of [the] statute will produce a result demonstrably at odds with the intention of its drafters.'" *Gardner v. Derwinski*, 1 Vet.App. 584, 586-87 (1991) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982)), *aff'd sub nom. Gardner, supra*. The "absurd result" exception to the plain meaning rule is narrow and limited to situations "'where it is quite impossible that Congress could have intended the result . . . and where the alleged absurdity is so clear as to be obvious to most anyone.'" *Gardner*, 1 Vet.App. at 587 (quoting *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 470-71 (1989) (Kennedy, J., concurring)). However, for the reasons that follow, I cannot conclude on the record before us that a plain reading of section 5313, that is, a reading that finds that the statute does not reduce the compensation of persons incarcerated in institutions other than "Federal, State, or local . . . institution[s]", 38 U.S.C. § 5313(a)(1), would necessarily produce an absurd result.

As a preliminary matter, I note that the current version of section 5313 is virtually unchanged from the provision originally enacted by Congress in October 1980 in section 504 of the Veterans' Disability Compensation and Housing Benefits Amendments of 1980, Pub. L. No. 96-385, § 504, 94 Stat. 1528, 1534 (Oct. 7, 1980). *Compare id. with* 38 U.S.C. § 5313 (2002). As set forth below and explained in great detail in my concurring opinion in *Bolton v. Brown,* 8 Vet.App. 185, 194-97 (1995) (Steinberg, J., concurring), a review of the legislative history of that provision reveals that it was the result of a compromise between the Senate and the House of Representatives. In this regard, the Explanatory Statement prepared by the House and Senate Committees on Veterans' Affairs reflects as follows regarding the details of the compromise agreement that became section 504 of Public Law 96-385:

> Sec. 504. The House bill would amend chapter 55 of title 38, United States Code, to provide that, during a service-connected disabled veteran's confinement in a Federal, State, or local penal institution as the result of the veteran's conviction of a felony or misdemeanor, the veteran's compensation may not exceed $60 per month after the first 60 days. Under this provision, the reduction after 60 days of incarceration would apply only to veterans rated 20 percent or more disabled, as long as the 10-percent rate is less than $60 per month. Amounts not paid to the veteran

13

could be apportioned to the veteran's dependents. A similar limitation would apply to incarcerated recipients of DIC and death compensation payments. This provision would be effective with regard to payments for months after September 30, 1980. The Senate amendment does not contain a comparable provision.

The compromise agreement provides for a limitation along the lines of the House bill with the following provisions:

(1) The limitation would apply only to persons incarcerated for a felony conviction.

(2) The limitation would apply only to those whose offense is committed after the date of the enactment of this section and to those who are incarcerated on October 1, 1980, and awarded compensation or DIC after that date.

(3) The limitation would not apply to a person while he or she is participating in a work-release program or residing in a half-way house.

(4) Apportionments to dependents of veterans would be provided for under the same terms and conditions as are apportionments made pursuant to section 3107 of title 38, [currently enumerated as 38 U.S.C. § 5307,] which governs apportionments in the cases of non-incarcerated compensation beneficiaries. Apportionments of DIC would be provided for in a similar manner. However, no apportionment of the compensation, DIC, or death compensation of a person to whom the limitation applies could be made to a dependent who is incarcerated for conviction of a felony.

(5) With respect to veterans, the compromise agreement would limit the monthly amount of compensation payable to veterans rate[d] 20 percent or more disabled to the 10-percent rate ($54 under the compromise agreement) and, to veterans rated zero or 10 percent disabled, to half of the 10-percent rate ($27). The limitation would thus apply to all veterans rated as 10 percent or more disabled and to those whose rating is zero percent but who receive the rate provided under section 314(k) of title 38[, currently enumerated as 38 U.S.C. § 1114(k)]. With respect to DIC and death compensation recipients, the monthly amount payable would be limited to half of the 10-percent rate.

(6) No adjudications of total disability based on individual unemployability would be permissible during the period of the veteran's incarceration.

Under the compromise agreement, this section would be effective on the date of enactment.

The Committees note that it is their intention that the limitations provided for under the compromise agreement apply to persons convicted of felonies and sentenced to imprisonment while they are institutionalized in a hospital facility on transfer from (but not on parole from) a penal institution. In cases of prison-to-hospital transfer, the Committees consider that the hospital is serving as an agent of the penal institution. As has been noted, the limitation would not apply during a period during which the individual is participating in a work-release program even though, under such program, he or she returns to confinement during evenings or weekends. Restoration to the full rate would occur upon the person's release from incarceration, including release on parole. At such times, of course, any amount apportioned to dependents would be appropriately adjusted.

The Committees intend that, at the time action is taken to reduce an incarcerated veteran's or survivor's benefits under this section, . . . VA provide such veteran or survivor and those to whom apportionments may be made with notice of these apportionment provisions.

Explanatory Statement, Pub. L. No. 96-385, 96th Cong., 2d Sess. (1980), *reprinted in* 1980 U.S.C.C.A.N. 3323, 3326-27; *see Bolton*, 8 Vet.App. at 194-97 (Steinberg, J., concurring) (setting forth pertinent legislative history of section 5313); *see also* 126 CONG. REC. 27,014 (1980); 126 CONG. REC. 26,110, 26,119-20 (1980).

Although the House of Representatives, in July 1980, had passed H.R. 7511 with an incarcerated-person provision in it, *see* 126 CONG. REC. 18,789 (1980), neither the Senate-introduced bill nor the initial Senate-passed bill, which contained an amendment to the House-passed bill, included a provision with respect to the limitation of compensation and DIC for incarcerated persons. *See* S. REP. NO. 96-876 (1980); 126 CONG. REC. 9,767-70 (1980); 126 CONG. REC. 21,426-30, 21,447 (1980). However, as set forth in the Explanatory Statement, above, a subsequent compromise involving the Senate's amendment to the House-passed bill and the House's further amendment to that amendment was ultimately agreed upon by the two Committees on Veterans' Affairs, *see* 126 CONG. REC. 26,110 (1980), and on September 24, 1980, the Senate concurred in the House amendment to the Senate amendment. 126 CONG. REC. 27,017 (1980).

Moreover, with respect to the compromise brokered between the Senate Committee and the House Committee, the Chairman of the Senate Committee explained in pertinent part:

[W]e . . . . argued strongly against the House provisions in H.R. 7511 limiting the payments of disability compensation and DIC to veterans and survivors during their incarceration for criminal convictions. However, much to our regret, we were unable

15

to convince our House colleagues to accept our position . . . . Although they would not yield entirely from the House position, they were willing to make substantial concessions on the provision itself.

. . . .

Mr. President, the House bill, but not the Senate amendment, would have limited the amount of compensation and DIC benefits payable to persons who are incarcerated in penal institutions for felony or misdemeanor convictions. Under the House bill, compensation or DIC, after the first 60 days of incarceration, could not exceed $60 per month.

. . . .

The compromise agreement provides for a limitation that would apply only to those who are convicted of felonies and only in situations where the offense is committed after the date of the enactment of this section or, if before, to those who are incarcerated on October 1, 1980, and awarded compensation or DIC after that date while incarcerated. The limitation would not apply at all to a person while he or she is participating in a work-release program or residing in a halfway house.

. . . .

Mr. President, in my view and in the view of other [C]ommittee members, the House-passed provision not only raised questions of fundamental fairness but also threatened basic principles underlying the service-connected compensation programs. However, with the utmost reluctance and recognizing the depth of the feelings in the other body with regard to the issues involved – and, as I previously noted, Senator THURMOND and I personally met with Representatives MONTGOMERY and WYLIE – we have reached an accord on the provisions in the compromise agreement, provisions that I believe are consistent with notions of fundamental fairness.

I would like to emphasize that the limitation would apply only prospectively. It would apply generally only to those who commit felonies after the date of enactment, and no person who is currently serving a period of incarceration would, as a result thereof, lose any compensation benefits which he or she has been awarded prior to October 1.

. . . .

In my view, the various modifications of the House provisions reflected in the compromise agreement go far to overcome many of our [C]ommittee's objections to

16

this part of the House bill, and I appreciate the cooperation of the House Members in working out these provisions with us.

126 CONG. REC. at 27,011-16 (statement of Sen. Cranston). With regard to the final compromise legislation, the ranking minority member on the Senate Committee offered the following statement:

> Mr. President, the original legislation by the House contained a provision that would deny compensation benefits to a veteran once that veteran became incarcerated, and upon release these benefits would be reinstated. The Senate bill did not address this issue. However, during consideration of this matter by the members of both Veterans' [Affairs] Committees, to reach a suitable resolution, the very theory and purpose of service-connected compensation was discussed. The compromise agreement, Mr. President, is not what I wanted nor was it the position of the Senate; yet, the House felt strongly on this matter and I believe this compromise is the best that could have been achieved under the circumstances.

> Mr. President, VA compensation is paid to a veteran for his service-connected disability. The rate of payment reflects the average impairment of earning capacity as a result of this disability. It is my opinion that the economic or social status of the veteran should not determine his receipt of compensation. If a veteran's status in life was considered to be a factor in the receipt of compensation, then the argument could be made that a veteran who has a certain income level should have his compensation reduced. Thus, receipt of compensation would be need-based and not totally related to a disability incurred while in service.

*Id.* at 27,017 (statement of Sen. Thurmond). These statements illustrate the conflict between the House and the Senate over the fundamental principles of service connection. *See also* Explanatory Statement*, supra*.

Finally, in contrast to Congress' concern regarding limiting the scope of section 5313, the appellant directs the Court's attention to a Social Security statutory provision that he contends illustrates Congress' clear intent to bar all beneficiaries who are "confined in a jail, prison, or ***other*** penal institution or correctional facility" from receipt of Social Security benefits. 42 U.S.C. § 402(x)(1)(A)(i) (emphasis added); *see* Appellant's Reply Br. at 5. In this regard, at the time that Congress was legislating section 5313, it enacted an amendment to the Social Security Act (SSA), which, inter alia, suspended the payment of benefits to individuals incarcerated for a felony conviction. That amendment was contained in section 5(c) of Public Law No. 96-473, which provided:

> (c) Section 223 of [the SSA] is amended by adding at the end thereof the following new subsection:

"Suspension of Benefits for Inmates of Penal Institutions[.]

> "(f)(1) Notwithstanding any other provision of this title, no monthly benefits shall be paid under this section . . . by reason of being under a disability, to any individual for any month during which such individual is confined in a jail, prison, ***or other penal institution or correctional facility***, pursuant to his conviction of an offense which constituted a felony under applicable law, unless such individual is actively and satisfactorily participating in a rehabilitation program which has been specifically approved for such individual by a court of law and, as determined by the Secretary, is expected to result in such individual being able to engage in substantial gainful activity upon release and within a reasonable time.["]

Social Security Act–Retirement Test, Pub. L. No. 96-473, § 5(c), 94 Stat. 2263, 2265 (1980) (emphasis added) (codified at 42 U.S.C. § 402(x)). This provision originated as an amendment added by the Senate Finance Committee to H.R. 5295 as passed by the House, *see* Pub. L. No. 96-473, 96th Cong., 2d Sess. (1980), *reprinted in* 1980 U.S.C.C.A.N. 4787, 4794-95; S. REP. NO. 96-987 (1980); 126 CONG. REC. 36,969 (1979), and was included in the Senate-passed H.R. 5295, *see* 126 CONG. REC. 28,193-95 (1980). The Finance Committee explained as follows this provision in the bill as reported:

> The [C]ommittee believes that the basic purposes of the [S]ocial [S]ecurity program are not served by the unrestricted payment of benefits to individuals who are in prison or whose eligibility arises from the commission of a crime. The disability program exists to provide a continuing source of monthly income to those whose earnings are cut off because they have suffered a severe disability. The need for this continuing source of income is clearly absent in the case of an individual who is being maintained at public expense in prison. The basis for his lack of other income in such circumstances must be considered to be marginally related to his impairment at best.

> The [C]ommittee bill therefore would require the suspension of benefits to any individual who would otherwise be receiving them on the basis of disability while he is imprisoned by reason of a felony conviction.

S. REP. NO. 96-987, Pub. L. No. 96-473, 96th Cong., 2d Sess. (1980), *reprinted in* 1980 U.S.C.C.A.N. at 4794-95. As to that Senate-passed amendment, shortly before the House agreed to it, the ranking minority member of the House Ways and Means Committee stated:

> The matter of primary concern to the House here, as I understand it, has to do with [S]ocial [S]ecurity benefits for those convicted of felonies or crimes in the nature of a felony in jail. There has been considerable concern expressed in this House as a result of the Son of Sam case where it was disclosed that this convicted

murderer in Attica State Prison was receiving substantial disability benefits under [S]ocial [S]ecurity because of his mental disability, determined in the trial whereby he was found guilty.

126 CONG. REC. 28,675-77 (1980) (statement of Rep. Conable); *see* 126 CONG. REC. 29,151 (1980) (Senate final passage of H.R. 5295 as further amended by the House).

The provision suspending Social Security benefits has been amended several times since its enactment in 1980. *See generally* Ticket to Work and Work Incentives Improvement Act of 1999, Pub. L. 106-170, § 402, 113 Stat. 1860, 1907-09 (Dec. 17, 1999); Social Security Domestic Employment Reform Act of 1994, Pub. L. No. 103-387, § 4(a)(1), (2), 108 Stat. 4071, 4076 (Oct. 22, 1994). Currently, that statute provides in relevant part:

> **Limitation on payments to prisoners and certain other inmates of publicly funded institutions**.
>
> > (1)(A)   Notwithstanding any other provision of this subchapter, no monthly benefits shall be paid under this section . . . to any individual for any month ending with or during or beginning with or during a period of more than 30 days throughout all of which such individual–
> >
> > > (i)   is confined in a jail, prison, ***or other penal institution or correctional facility*** pursuant to his conviction of a criminal offense,
> > >
> > > (ii)   is confined by court order in an institution *at public expense* in connection with–
> > >
> > > > (I)  a verdict or finding that the individual is guilty but insane, with respect to a criminal offense,
> > > >
> > > > (II)  a verdict or finding that the individual is not guilty of such an offense by reason of insanity,
> > > >
> > > > (III)  a finding that such individual is incompetent to stand trial under an allegation of such an offense, or
> > > >
> > > > (IV)  a similar verdict or finding with respect to such an offense based on similar factors (such as a mental disease, a mental defect, or mental incompetence), or
> > >
> > > (iii)  immediately upon completion of confinement as described in clause (i) pursuant to conviction of a criminal offense an element of

which is sexual activity, is confined by court order in an institution at public expense pursuant to a finding that the individual is a sexually dangerous person or a sexual predator or a similar finding.

(B)(i) For purposes of clause (i) of subparagraph (A), an individual shall not be considered confined in an institution comprising a jail, prison, ***or other penal institution or correctional facility*** during any month throughout which such individual is residing outside such institution at no expense (other than the cost of monitoring) to such institution or the penal system or to any agency to which the penal system has transferred jurisdiction over the individual.

42 U.S.C. § 402(x) (boldface-italic emphasis added).

It is clear that, by amending the provision, Congress over the past 20 years has affirmatively expanded the scope of 42 U.S.C. § 402(x) to include, inter alia, any person confined to "a jail, prison, or ***other penal institution or correctional facility***" and any person confined to "***an institution at public expense***." *Ibid.* (emphasis added). In contrast, the amendments to section 5313 have not expressly expanded the provision's scope to include the "other penal institutions or correctional facility" or "institution at public expense" language of 42 U.S.C. § 402(x) or to reflect the trend of the privatization of penal institutions.[2] Indeed, the broadness of the contemporaneously enacted section 402(x) cannot be imported into section 5313. *See Skinner v. Brown*, 27 F.3d 1571, 1576 (Fed. Cir. 1994) ("It may be unusual that Congress chose not to tie [Restored Entitlement Program for Survivors] payments to the same time restrictions that applied under the Social Security Act, but it is hardly absurd to conclude, as the government suggests, that it meant to do so under these circumstances given the plain statutory language.").

Thus, based on the Explanatory Statement that reflects the compromise between the House and Senate Committees on Veterans' Affairs'; the statements made by Senators Cranston and Thurmond regarding the brokering of the compromise legislation; the absence of any reference to persons incarcerated in privately owned and operated institutions or elsewhere at public expense similar to those references that appear to broaden the effect of 42 U.S.C. § 402(x); and the lack of substantial amendments to section 5313 since its enactment, I am unable to conclude, as the Secretary urges, that applying section 5313 only to those persons entitled to compensation who are incarcerated in a "Federal, State, or local . . . institution", 38 U.S.C. § 5313(a)(1), undoubtedly would produce an absurd result.[3]

---

[2] *See generally* http://www.doc.state.ok.us/Private%20Prisons/private_prison_admin.htm (last visited Aug. 23, 2004) (providing hyperlink to pdf document containing survey of private prison rates by state).

[3] *See Trilles v. West,* 13 Vet.App. 314, 324 (2000) (en banc)*; Holliday v. Principi*, 14 Vet.App. 280, 285 (2001); *see also Simmons*, *Thayer*, *Cottle Faust*, *Davenport*, all *supra* note 1; *Gardner v. Derwinski*, 1 Vet.App. 584,

On remand, the Board should ensure complete development of the appellant's claim, to include the securing of complete copies of any and all documents related to DCF's relationship with the ODOC and any and all documents pertaining to the appellant's transfer of custody to DCF, *see* 38 U.S.C. § 5103A(b); 38 C.F.R. § 3.159(c)(1) (2003) (setting forth VA's duty to assist claimant in obtaining records not in custody of Federal department or agency), and provide a thorough discussion so as to enable the appellant to understand the precise basis for the Board's decision and to facilitate review in this Court, if again sought. *See Caluza*, *Gabrielson*, and *Gilbert*, all *supra*; *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991) (remand is meant to entail critical examination of justification for decision; Court expects that BVA will reexamine evidence of record, seek any other necessary evidence, and issue timely, well-supported decision); *see also Fortuck v. Principi*, 17 Vet.App. 173, 181 (2003) (noting that Veterans Claims Assistance Act of 2000, Pub. L. No. 106-475, 114 Stat. 2096, and its implementing regulations at 38 C.F.R. § 3.159 will apply on remand from Court).

### III. Conclusion

In my view, it is the Court's duty to remand this case – just as it was the duty of the Board to provide a decision that dealt with the principal legal question involved in such a way, based on the evidence of record, as to permit us to carry out effective judicial review. This Court cannot perform the Board's task for the Board or decide the case on an evidentiary record on which the Board did not rely in its decision. If, upon further review of the circumstances surrounding this case, it is concluded that an amendment of the statute is in order to make express in law what the Secretary believes is there, such action is the province of the legislative branch and not within our jurisdiction.

GREENE, J., *dissenting*: I do not join the Court's per curiam order today, because I feel that the record is adequate for judicial review. Furthermore, the question at issue is a question of law that I believe the Court can and should answer.

Initially, I cannot agree with the conclusion that the Board has "not yet addressed" the question of whether Mr. Wanless is incarcerated in a State penal institution. *Ante* at 1. In fact, the Board spends three full paragraphs discussing the veteran's arguments on this very question, i.e., the question of whether the DCF, as a private prison contractor, constitutes a 'State . . . penal institution" within the meaning of 38 U.S.C. § 5313(a)(1). In the first two, the Board addresses and rejects the authority relied upon by Mr. Wanless in support of his views of section 5313. R. at 4-5. In the last, the Board correctly observes that his incarceration in a privately-managed prison does not negate the fact that he is serving time for a felony conviction imposed under Oklahoma state law. R. at 5. As shown below, the Board decision, though imperfect, is more than adequate.

---

586-87 (1991), *aff'd sub nom. Gardner v. Brown*, 5 F.3d 1456 (Fed. Cir. 1993)*, aff'd,* 513 U.S. 115 (1994).

First, the Board's conclusion that Mr. Wanless is imprisoned for a State felony conviction follows Oklahoma law. In *Washington v. Cornell Corr. Inc.*, the Court of Civil Appeals of Oklahoma addressed a civil suit brought by a prisoner incarcerated in a privately owned prison facility, and noted both that the prisoner had been "sentenced to a term of confinement in DOC custody," and that his "confinement at GPCF [(Great Plains Correctional Facility)], although privately owned, does not alter his status as a prisoner." *Washington*, 30 P.3d 1162, 1164 (Okla. Civ. App. 2001). Under OKLA. STAT. tit. 57, § 561(A), the Oklahoma Department of Corrections is authorized to contract with private prisons contractors for the operation of a prison. However, such a contractor must demonstrate "[t]he ability to comply with the standards of the American Correctional Association and with specific court orders." Okla. Stat. tit. 57, § 561.1(C)(2). There is no merit in Mr. Wanless' argument that he is not, under section 5313, in Oklahoma DOC custody and incarcerated as a prisoner in a State penal institution. (To the extent that it might be argued that Mr. Wanless was only *sentenced* to confinement in DOC custody, but is now serving in something *other* than DOC custody, such a view would have this Court (or the Board on remand) contemplate a statement that the State of Oklahoma is contravening the order of the trial court by placing the veteran in a private prison over which there is no State control or recognition of the confinement terms for his felony conviction. Mr. Wanless does not argue that he is not under State control and the statutes authorizing private prisons contradicts any such theory.)

Second, the Board's rejection of Mr. Wanless' argument regarding section 5313 is wholly in line with the view (which I share) that interpreting section 5313 in the manner proposed by him would lead to "a result demonstrably at odds with the intention of its drafters." *Gardner v. Derwinski*, 1 Vet.App. 584, 586-87 (1991), *aff'd sub nom. Gardner v. Brown*, 5 F.3d 1456 (Fed. Cir. 1993), *aff'd*, 513 U.S. 115 (1994). Indeed, the Secretary does an excellent job of explaining the legislative history of section 5313:

> The course the Appellant charts in this appeal would lead to an "absurd" result. In 1980, prior to the passage of 38 U.S.C. § 5313, the Honorable G.V. 'Sonny' Montgomery, the principal sponsor of H.R. 7511, 96th Cong., the bill that became Pub.L. No. 96-385, explained the basis for the legislation as follows:
>
>> I do not see the wisdom of providing hundreds and thousands of dollars of tax free benefits to incarcerated felons when at the same time the taxpayers of this country are spending additional thousands of dollars to maintain these same individuals in penal institutions. . . .
>
> 126 Cong. Rec. 26, 118 (1980); *see* VAOPGC PREC 59-91. Additionally, Congressman Wylie stated, "[i]n the case of imprisonment, when a prisoner is being fully supported by tax dollars that fund the penal institution, it becomes ludicrous to continue payment of benefits designed to help him maintain a **standard** of living." 126 Cong. Rec. 26, 122 (1980) (emphasis in original).

Secretary's Br. at 10-11.

It should be noted that nowhere among the concerns expressed, nor among any other statement in the legislative history, is there a *single* statement that suggests that Congress was concerned whatsoever about limiting section 5313 so that it did not apply to individuals convicted by the Federal government or a State or local government, whose incarceration is carried out by a privately run contract-penal institution. Rather, Congress appeared to be concerned with the limitation of benefits to *any* incarcerated veteran, which was finally accomplished with a global limitation, based on the nature of the underlying offense (i.e., it applies only to felonies) and to incarceration after a set date.

In this case, Mr. Wanless believes that there is in section 5313 a distinction between prisoners incarcerated in state-owned prisons and those incarcerated in privately run (but state-contracted) prisons. Thus, he argues that he is entitled to the full amount of his VA benefits, rather than the reduced amount available to prisoners in actual DOC prisons. His belief is misplaced. There should be no dispute but that privately managed prisons are still operated *under contract* for the state, meaning that *the state is still expending funds to incarcerate these prisoners*. *See generally* http://www.doc.state.ok.us/Private%20Prisons/privatep.htm (visited Aug. 17, 2004) ("Private Prisons with Oklahoma DOC Contracts"; listing per diem expense to state per inmate).[1] Thus, I would hold that such arrangements are still well within the legislative intent of section 5313; the reasons for not helping a prisoner at a privately run institution maintain a standard of living are identical to the reasons for not doing so for a prisoner at a publicly run institution. The Board, in making its conclusion rejecting Mr. Wanless' argument, was, consciously or not, recognizing that his argument would lead to an "absurd result." *See United States v. X-Citement Video, Inc.,* 513 U.S. 64, 69-70 (1994) (noting the Court's "reluctance to simply follow the most grammatical reading of the statute").

By vacating the Board decision and remanding this matter, the majority must, necessarily, believe that Mr. Wanless' argument should be given credence, i.e., that there may be a result here that negates application of the "absurd result" doctrine; if it felt otherwise and still remanded this matter, it would be acting in contravention to the dictates of the holding of *Gardner*, *supra*. The majority's sub silentio finding that it cannot undoubtedly conclude that it would be an absurd result if section 5313 applied only to persons incarcerated in a "Federal, State, or local . . . institution" and not to persons incarcerated in government-contracted, privately run facilities does not, of course, offer any basis on how Congress could have intended such a distinction. Indeed, there is no need for such a distinction, and no indication that Congress ever entertained, let alone acted on, such a strained interpretation. To conclude, as the majority must in order to find error here, that Congress may have sought to ameliorate these concerns by differentiating between prisoners confined in private prisons

---

[1] Oklahoma law authorizes the Oklahoma DOC to contract with privately-owned prisons to house and care for Oklahoma prisoners. *See* OKLA. STAT. tit. 57, §§ 561(A), 561.1(B) (2003). Although the statute doesn't require the DOC to have a stated rationale for doing so, it is likely that such facilities may be necessary because the state cannot adequately house (for monetary or other reasons) some prisoners.

operated for the State versus those confined in actual State-owned prisons, quite simply, leads to an absurd result. Such a conclusion presumes a Congressional intention to create a sort of random, lottery-type veterans benefits system. A veteran convicted of a felony and incarcerated in a state-owned prison is eligible only for reduced benefits. But a veteran similarly convicted and sentenced but incarcerated in a privately run, state-contracted prison is eligible for full benefits. Congress could not have intended this result.[2]

The majority's insistence here on having the Board conduct a detailed analysis of the contract between CCA and the Oklahoma DOC avoids the critical, indisputable fact: Mr. Wanless is a prisoner convicted of a felony by the State of Oklahoma and ordered imprisoned by that State at public expense. Nothing in the contract between CCA and DOC can change that fact.[3] Even if the contract *explicitly* stated that this facility was *not* a State penal institution, section 5313 would still apply here with full force. This is because the authority in this situation flows from the statute down, not from the contract up. No contract can alter the basic intent of section 5313, which was to limit payments designed to maintain a standard of living to veterans who were already being housed, clothed, and fed at public expense. No matter how the Oklahoma DOC and CCA want to classify the arrangement, if these prerequisites are in place, section 5313 applies.[4] Any contrary conclusion is inconsistent with the concept that "the law is not an abstract concept removed from the society it serves." Sandra Day O'Connor, *A Tribute to Justice Thurgood Marshall: Thurgood Marshall: The Influence of a Raconteur*, 44 STAN. L. REV. 1217, 1218 (1992).

There does not seem to be any rationale for treating veterans incarcerated for state felony convictions in a state-contracted, privately owned facility more favorably than veterans incarcerated in state-owned prisons. I believe that both are State penal institutions. Indeed, since section 5313

---

[2] Note that a result awarding full benefits to an incarcerated veteran would effectively divest apportionees of their right to such funds, and it would be logical for Congress to have an interest in having VA assist such apportionees.

[3] Indeed, we may judicially note that the Davis Correctional Facility is one of the CCA facilities with an Oklahoma DOC contract. As such, it could be concluded to be an agent of the State of Oklahoma and therefore a State prison for purposes of section 5313. *See* http://www.doc.state.ok.us/Private%20Prisons/privatep.htm (visited Feb. 26, 2004) (listing Davis Correctional Facility, where Mr. Wanless is incarcerated, as one of the private prisons with which Oklahoma DOC contracts). *See also Smith (Brady) v. Derwinski*, 1 Vet.App. 235, 238 (1991) (noting that "[c]ourts may take judicial notice of *facts* not subject to reasonable dispute"). I note that the information is not disputed by either party, is readily accessible to the public, and is therefore "not subject to reasonable dispute," *Smith (Brady)*, *supra*; thus we need not engage in any factfinding to take note of this information. Furthermore, regardless of whether we use this information or not, this much is clear: Mr. Wanless was convicted by the State of Oklahoma and is now incarcerated in the United States. Furthermore, nobody, not even Mr. Wanless, disputes that he is being incarcerated at, at a minimum, the behest of the State of Oklahoma, and nobody has alleged that the Davis Correctional Facility is housing Mr. Wanless free of charge. Given these facts, it seems an elementary deduction to arrive at the fact that he is, for purposes of section 5313, being incarcerated by a branch of Federal, State, or local government.

[4] The only likely situation in which I see section 5313 *not* applying would be one where a veteran is imprisoned in a foreign country (and hence not being cared for at the expense of the United States).

was enacted, states (and the Federal government) have increasingly turned to private prison contractors as a way to save funds and to house prisoners where State facilities are inadequate. Indeed, in many states, the proportion of prisoners in privately run institutions is very high; for example, 43.4 % in New Mexico, 29.3% in Alaska, 16.5% in Mississippi, and 28.9% in Oklahoma. *See* www.doc.state.ok.us/MAPS/US_PC_private.htm (visited Feb. 27, 2004).

This is a case in which "the law and not the evidence is dispositive." *Sabonis v. Brown*, 6 Vet.App. 426, 430 (1994). The Board decision should be affirmed.

I respectfully dissent.